UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA GARCIA,

|                           |                                         |
|---------------------------|-----------------------------------------|
| **Plaintiff,**            | **CIVIL ACTION NO. 8-12943**            |
| **vs.**                   | **DISTRICT JUDGE GERALD E. ROSEN**      |
| **COMMISSIONER OF SOCIAL SECURITY,** | **MAGISTRATE JUDGE MONA K. MAJZOUB** |
| **Defendant.**            |                                         |

_____/

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION:**    This Court recommends that Defendant's Motion for Summary Judgment (docket no. 10) be GRANTED, that Plaintiff's Motion for Summary Judgment (docket no. 8) be DENIED, and that Plaintiff's Complaint be DISMISSED, as there was substantial evidence on the record that Plaintiff remained capable of performing a significant number of jobs in the economy.

\*\*\*

## II.    PROCEDURAL BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income on September 30, 2005, alleging that she had been disabled and unable to work since September 16, 2003 due to bladder problems, left knee problems and anxiety. (TR 56-58, 102-11, 120, 351-53). The Social Security Administration denied benefits and income. (TR 48-51, 346-49). A requested *de novo* hearing was held on August 23, 2007 before Administrative Law Judge (ALJ) Philip E. Moulaison who subsequently found that the claimant was not entitled to a period of Disability and Disability Insurance Benefits or Supplemental Security Income because she was not

1

under a disability at any time through the date of the ALJ's February 13, 2008 decision.  (TR 15, 27, 354).  The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review.  (TR 3-5).  The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

### III.    PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

####    A.    Plaintiff's Testimony and Reports

Plaintiff was forty years old at the time of the administrative hearing.  (TR 358).  Plaintiff has high school education and past work experience as a cashier, a production worker in the auto industry and a bendex operator.  (TR 87, 359-60).  Plaintiff testified that she has not worked since she was injured on her job in October 2004 which resulted in injury to her left knee cap.  (TR 336, 359).  Plaintiff lives with her father and sister.  (TR 367-68).  Plaintiff testified that she is able to cook and clean her own dishes but does not do housework.  (TR 361).  She can do laundry but takes breaks while doing it and she goes grocery shopping twice a week.  (TR 73).  She reports that she is able to prepare sandwiches, television dinners and soups and she can take care of her cat.  (TR 72-73).

Plaintiff takes methadone for pain in her left knee.  (TR 362).  Plaintiff testifies that she has a shooting, sharp pain from her thigh to her knee and sometimes her knee goes out on her when she is walking.  (TR 366).  She testifies that she lies down and elevates her leg for three to four hours of an eight hour period for pain.  (TR 369).  Plaintiff testified that she must use handrails to climb a flight of stairs, or go up them backwards.  (TR 364).  She can walk on level ground for fifteen minutes before she has to stop and rest.  (TR 364).  She testified that she must alternate standing and

sitting in fifteen minute intervals and she cannot squat.  (TR 364-65).  If not, her knee goes numb, gets achy and stiff from sitting too long.  (TR 364).  Plaintiff can lift a gallon of milk and carry it across a room.  (TR 365).  Plaintiff has no restrictions with her arms.  (TR 365).

Plaintiff also complains of interstitial cystitis which causes her to have to urinate frequently. (TR 362).  She alleges having lost jobs in the past due to this condition.  (TR 362).  Plaintiff testified that she takes Elmiron for her bladder, Serax for depression and anxiety and Methadone for pain. (TR 363-64).  Plaintiff asserts that the medications make her drowsy and nauseated.  (TR 368).  She testified that she had carpal tunnel syndrome and cold bothers her.  (TR 365-66).  Plaintiff testified that she had a problem with drug use in the past, including crack cocaine.  She reports that she stopped using in October 2006, after she was seen in an emergency care center.  (TR 367).

Plaintiff complains of depression and anxiety and reports that she takes medication for them and she cries all the time.  (TR 362-63, 371).  Plaintiff has not attended counsel and despite her doctor discussing counseling with her, she alleges that she has not had counseling yet because she forgot to make the appointment.  (TR 370).  Plaintiff testified that her doctor, Dr. Morrone, is conducting random drug tests on her once per month to make sure that she is not using street drugs. (TR 371).

### B.    Medical Record

Plaintiff injured her left knee at work in 2003.  (TR 206).  Plaintiff alleges having had two surgeries on her left knee but as the ALJ points out the record contains evidence of one surgery.  (TR 23, 368).  Plaintiff treated with Lester E. Webb, M.D., family practitioner, from October 2002 through December 2004.  (TR 166-77).  A September 30, 2003 MRI of the left knee without contrast revealed "abnormal signal intensity within the marrow of the inferior aspect of the patella, consistent with a bone contusion," small suprapatellar effusion and "[n]o evidence of meniscal tear or

3

ligamentous injury." (TR 195-96, 279).  October 6, 2003 x-rays of the left knee revealed a suspected joint effusion but were otherwise negative.  (TR 277).

Dr. Webb examined Plaintiff on March 22, 2004 prior to a left knee arthroscopy.  (TR 283). Dr. Webb noted that Plaintiff smokes two packs of cigarettes per day, drinks up to twelve beers in a day and uses no recreational drugs.  (TR 283).  Dr. Webb listed the following diagnoses for Plaintiff: Osteoarthritis of the left knee, tobacco abuse, ETOH abuse, interstitial cystitis and depression with anxiety.  (TR 283).  May 2004 notes from Dr. Webb show that Plaintiff reported that her knee gives out and she has clicking and crepitation in the knee.  She was prescribed Vicodin. (TR 167).

From October 2003 through January 2005 Plaintiff treated at Saginaw Valley Bone & Joint Center, P.C.  (TR 209-25).  Plaintiff treated predominately with Bryon C. Chamberlain, M.D., who diagnosed Plaintiff with patella and patella tendon contusion in October 2003.  (TR 225).  In January 2004 Dr. Chamberlain noted that Plaintiff was "getting a little better" but had injured her kneecap again by falling.  (TR 224).  X-rays showed an old fracture of the patella which had healed and been re-exacerbated with the fall.  (TR 224).  Dr. Chamberlain prescribed physical therapy three times a week for four months and advised Plaintiff to stay off work or on a "very limited duty desk job only for the next four weeks."  (TR 224, 230).  Plaintiff attended twelve physical therapy sessions and missed nine.  (TR 231). The therapist noted in the Discharge Summary that Plaintiff reported that she was not active with her home exercise program.  (TR 231).

In March 2004 Dr. Chamberlain restricted Plaintiff to four more weeks without work but reported that "she will definitely be able to do her job completely with no restrictions in four weeks."  (TR 222).  On March 15, 2004 the doctor noted that Plaintiff may resume work "without any restrictions by March 22nd."  (TR 221).  On March 18, 2004 the doctor recommended

4

arthroscopic debridement of the patellofemoral articulation because she continued to have significant discomfort. (TR 219). On March 31, 2004 Plaintiff underwent arthroscopic surgery and debridement of the anterior impinging synovium of the left knee performed by Bryon D. Chamberlain, M.D. (TR 267-74). At that time Plaintiff was taking medications Serax, Vicodin, Necon and Zoloft. (TR 271). In April 2004 Plaintiff reported that Oxycodone was not effective for her pain and the doctor prescribed Vicodin ES. (TR 219). In April 2004 Plaintiff also underwent a post-op knee scope. Dr. Chamberlain noted that Plaintiff could fully extend, continued to complain of pain in the anterior aspect of the knee and had no ligamentous laxity. (TR 215).

On May 3, 2004 Dr. Chamberlain noted that Plaintiff had full extension, full flexion and little if any edema. (TR 212). The March 31, 2004 arthroscopy had revealed "no significant abnormalities in the medial or lateral compartment and the patella." (TR 212). Dr. Chamberlain advised Plaintiff to continue her range of motion strengthening exercises and resume full activities at work in the next two weeks. (TR 212). He further noted that "[w]e could not justify keeping her out of work any further or keeping her on any significant restrictions any further." (TR 212).

On January 17, 2005 Plaintiff treated with Kurt A. Menapace, M.D., for complaints of left knee pain. (TR 209-10). Dr. Menapace noted that Plaintiff "has pain out of proportion to her exam here," and he explained to her "that she needs to get her pain medicines from one physician and that should be Dr. Ononuju or Dr. Webb, who control her other medications." (TR 209). He also advised her that "it was best that she continue to follow up with Dr. Chamberlain or Dr. Weir." (TR 209).

From February 2005 through September 2007 Plaintiff treated at Health Delivery, Inc. (TR 150-53, 201-07, 285-89, 292-323, 327-335). Plaintiff continued to be prescribed Vicodin for pain. (TR 150-53). The records consistently note "chronic pain" and "anxiety." On March 24, 2005 the

treatment provider noted that Plaintiff was taking Vicodin, anxiety medication and buproprion [bulpropion] and was requesting a sleeping pill she had taken in the past called "Oxycontin." The provider noted that Plaintiff "exhibits drug seeking behavior." (TR 204). A September 19, 2005 x-ray of the left knee showed no dislocation, fracture, point traumatic deformity or joint effusion. (TR 163).

On December 9, 2005 Heather Marti-Clu, enhanced examiner, completed a Physical Residual Functional Capacity Assessment. (TR 139-46). Ms. Marti-Clu concluded that Plaintiff has the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and should avoid constant pushing and pulling with the left lower extremity. (TR 140). Plaintiff should never climb ladders, ropes or scaffolds and is limited to occasionally climbing ramps and stairs. (TR 141). On December 13, 2005 and again on January 11, 2006 Plaintiff underwent a lumbar epidurogram and "continuous epidural sympathetic infusion block under fluoroscopy" for post traumatic left knee pain and possible complex regional pain syndrome. (TR 158-61).

Notes from Health Delivery, Inc. show that on June 14, 2006 the treatment provider noted "no more narcotics" due to Plaintiff's admission to Healthsource. (TR 307-09). The Healthsource report is not part of the record. The Health Delivery, Inc. notes reference Healthsource's report that Plaintiff admitted buying Vicodin on the street. (TR 307). On July 6, 2006 Plaintiff requested a transfer to another treatment location and reported that she did not feel comfortable with any of the physicians at the current location. (TR 304). The treatment provider noted that Plaintiff is "aware that she will not receive narcotics at another site." (TR 304). On July 18, 2006 the treatment provider noted that Plaintiff was "not pleasant," "not cooperative," "very argumentative," and "only wanted her 'vikes'". (TR 303). Plaintiff refused three to four times to sign the pain/narcotic

6

management contract and only signed reluctantly.  (TR 303).  The provider noted, "I made it clear I only use methadone for chronic pain NO vicodin."  (TR 303).

On October 9, 2006 Plaintiff's father called to speak to the doctor and reported that Plaintiff is losing weight, abusing her methadone, snorting her methadone and taking street drugs with her medications.  (TR 295).  On October 12, 2006 Plaintiff was brought into the emergency room for substance abuse.  Plaintiff reported that she had been using crack cocaine for the past month and a half and she had about two hundred dollars worth of crack in the previous twenty-four hours.  (TR 290-91).  She had sold her truck for the two hundred dollars.  (TR 290).  A urine drug screen was positive for cocaine, benzodiazepines and methadone.  (TR 290).  Plaintiff reported taking methadone for a Vicodin addiction.  (TR 290).  She was not suicidal.  (TR 290).

On November 6, 2006 the Health Delivery, Inc. provider noted that Plaintiff called to ask whether she needs an office visit for refills of scripts due on November 17 or whether the doctor could call them in.  (TR 292).  Plaintiff was advised that she had to come in to the office for a refill and the doctor noted that she would need a urine drug screen before she was seen.  (TR 289, 292).  On November 7, 2006 Plaintiff reported that her sister stole her medication.  (TR 288).  The record shows several instances when Plaintiff called about her medication refills prior to when they were due.  (TR 296, 297, 298-301, 306-07, 310-11).  A urine drug screen in October 2006 was positive for cocaine and opiates.  (TR 318).  Drug screens in November and December 2006 were negative for both cocaine and opiates.  (TR 315, 316).

On January 2, 2006 Ronald C. Marshall, Ph.D., L.P., completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  (TR 121-138).  Dr. Marshall diagnosed Plaintiff with depression with anxiety.  (TR 124).  Dr. Marshall opined that Plaintiff has mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning

and maintaining concentration, persistence or pace, and no episodes of decompensation. (TR 131).
Dr. Marshall noted that Plaintiff "may work better with minimal contact with the public" and
"retains ability to do unskilled tasks on a sustain (sic) basis." (TR 133).

On October 4, 2007 Plaintiff underwent a psychiatric/psychological consultative examination
with Mark Zaroff, Ph.D., L.P. (TR 336-44). Dr. Zaroff noted that Plaintiff rode her bike to the
examination. He also noted that Plaintiff reported depression beginning in her late twenties and
alleges symptoms including tearfulness, isolation and preferring to stay home and watch television
and sleep. (TR 336). The doctor noted that Plaintiff reported drinking one time per month and
denied drug use, but when questioned by the doctor about a history of cocaine use, she reported that
she had not used cocaine since October 2006. (TR 337). Dr. Zaroff described that Plaintiff was
"somewhat glassy-eyed" at the beginning of the evaluation and "after approximately one hour of the
evaluation she appeared to be fairly lethargic." (TR 338, 340). The doctor described Plaintiff's
motor activity as "generally lethargic" and that she appeared to be "overmedicated." (TR 338, 340).
There was no evidence of pressured speech or illogical thinking and Plaintiff's thoughts were
"logical, organized and goal directed, although at times thought processing was slow." (TR 338).

Dr. Zaroff noted that Plaintiff's testing and evaluation results were "not consistent with her
educational background, having finished high school without any history of special education. The
results on the intelligence testing are considered invalid and the results overall are considered
symptomatic of exaggeration of symptomatology." (TR 340). Dr. Zaroff noted in the Record
Review that the "[p]rimary feature of her case appears to be opiate abuse and dependence." (TR 341)
Dr. Zaroff diagnosed Plaintiff with Opiate Dependence (304.00) and Major Depressive Disorder,
recurrent, severe without psychotic features (296.33). (TR 342). Dr. Zaroff concluded that Plaintiff
is not able to manage her benefit funds "due to ongoing drug abuse." (TR 342).

8

C.        **Vocational Expert Testimony**

The Vocational Expert (VE) classified Plaintiff's past work as a production worker as light and unskilled (SVP 2).  Her other past work occurred more than fifteen years ago.  (TR 373-74).  The VE testified that if they assumed Plaintiff's testimony, Plaintiff would not be able to perform her past relevant work and there would be no other work which she could perform.  (TR 374).  The ALJ asked the VE to assume Plaintiff could perform an eight hour day with a need to sit for six hours, stand for two hours, with a sit/stand option allowing frequent changing of positions and limited to lifting ten pounds frequently.  (TR 374).  The VE testified that there would be work that she could perform, including unskilled, sedentary work such as information clerk (12,800 in the region encompassing the "lower 2/3's of Michigan"), cashier (20,200 in the region) and inspector (2,100 in the region).  (TR 375).  The ALJ asked the VE to "assume further that the individual had mild restrictions of activities of daily living, moderate restrictions in difficult – and in difficulties in maintaining social functioning and moderately impaired in, in maintaining concentration and persistence or pace."  (TR 375).  The VE testified that Plaintiff would not be able to perform her past work or any of the jobs which the VE had identified.  (TR 375).

IV.    **ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 16, 2003, and suffered from status post left knee surgery, history of interstitial cystitis and polysubstance use disorder, all severe impairments.  The ALJ found that the severity of Plaintiff's polysubstance use disorder meets Listing 12.09 for substance abuse disorders and she is disabled when the polysubstance use disorder is considered.  (TR 26).  The ALJ found that Plaintiff's substance use disorder was a contributing factor material to her disability.  (TR 26).  The ALJ found that Plaintiff was not entirely credible and when her polysubstance use disorder is not considered,

she continued to have a severe impairment or combination of impairments but did not have an impairment or combination of impairments that meets or medically equals the Listing of Impairments and would have the residual functional capacity to perform her past relevant work and a broad range of light work.  (TR 26).   The ALJ found that Plaintiff had the RFC to perform a significant number of jobs in the economy and was not under a disability as defined in the Social Security Act.  (TR 26).

## V.   LAW AND ANALYSIS

### A.   Standard Of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter

10

differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

###   B.   Analysis

###   *1.   Scope of the Court's Review*

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)   she was not presently engaged in substantial gainful employment; and

(2)   she suffered from a severe impairment; and

(3)   the impairment met or was medically equal to a "listed impairment;" or

(4)   she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *Id.* §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational

11

expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ erred in giving substantial weight to an enhanced examiner's assessment, presenting an inaccurate hypothetical to the VE and relying on the VE's testimony as evidence, failing to find that Plaintiff suffers from depression and failing to include mental limitations in the hypothetical question to the VE.

**2.      *Whether Substantial Evidence Supports the ALJ's RFC Finding***

Plaintiff argues that the ALJ improperly relied on a physical RFC Assessment form completed by an Enhanced Examiner and erred when the ALJ stated that he gave "substantial weight to the State Agency medical consultants who reviewed the claimant's file and determined the claimant's physical [RFC] at Exhibit 1, page 25." (TR 139-46)

On December 9, 2005 an enhanced examiner completed a Physical Residual Functional Capacity Assessment and concluded that Plaintiff had the ability to occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight hour workday, sit for about six hours in an eight-hour workday, and was limited to avoiding constant pushing and/or pulling with the left lower extremity. (TR 140). The enhanced examiner further limited Plaintiff to occasional climbing of ramps and stairs and never climbing ladders, scaffolds or ropes. (TR 141).

The ALJ incorrectly referred to this assessment as a medical opinion from a State Agency medical consultant and gave it "substantial weight." (TR 24). The ALJ's RFC finding is very similar to that of the enhanced examiner. The ALJ found that when Plaintiff's polysubstance use is not considered, she retains the ability to lift and/or carry up to twenty pounds occasionally and ten pounds frequently, sit for six hours and stand and/or walk for six hours of an eight-hour

workday, must avoid constant pushing and/or pulling with the left lower extremity, is precluded from climbing ladders, ropes, and scaffolds, can frequently balance and can only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl.  (TR 21).

In *Dewey v. Astrue* the Eighth Circuit Court of Appeals remanded the ALJ's decision where the ALJ mistakenly credited a Physical Residual Functional Capacity Assessment as having been authored by a physician when it had been authored by a counselor, not a physician or other medical consultant.  *See Dewey v. Astrue*, 509 F.3d 447, 448 (8th Cir. 2007).  As a result of his mistaken belief, the ALJ gave controlling weight to the counselor's opinion that the claimant could perform light work and did not give controlling weight to the claimant's treating physician who opined that claimant could lift less then ten pounds or stand for two hours a day.  *Id.* at 459.  The *Dewey* court stated that

> "[t]he Commissioner argues that the error was harmless, but in light of the presence in the record of a more restrictive opinion from Dewey's treating physician, we cannot say that the ALJ would inevitably have reached the same result if he had understood that the Residual Functional Capacity Assessment had not been completed by a physician or other qualified medical consultant."  *Id.* at 449-50.

Unlike *Dewey*, Plaintiff has not shown, nor does the Court find upon review of the record, any evidence which supports more restrictive physical limitations than those set forth in the enhanced examiner's assessment.  The issue before this Court is similar to *Jones v. Astrue*, wherein the ALJ erroneously weighed a lay opinion as a medical opinion.  *Jones v. Astrue*, 2008 WL 1766964 at *10 (S.D. Ind. Apr. 14, 2008).  The *Jones* court noted that the lay consultant's opinion had been adopted by a second state agency physician consultant, the ALJ had compared the lay opinion and the medical opinion to the objective medical evidence and "found that both of these opinions were substantial supported by and were consistent with that evidence," and the claimant had not shown any evidence or made an argument "sufficient to cast into doubt whether, on this

record, the ALJ's outcome would have been different had she known that only one of the non-examining state agency consultants providing opinions was a physician." *Id.* The court concluded that "[w]ithout some indication that she [the ALJ] erroneously relied exclusively on the lay opinion in defiance of the objective medical evidence and other medical opinions in the record, the error does not warrant remand." *Id.*

Plaintiff has failed to show and the record does not contain a more restrictive RFC or evidence supporting more restrictive physical limitations. The ALJ examined the complete record and cited objective medical evidence and the lack thereof regarding Plaintiff's knee and allegations of degenerative joint disease. (TR 24). The ALJ cited Plaintiff's orthopaedic surgeon, Dr. Chamberlain, who opined on May 4, 2004 that Plaintiff could return to work and that he "could not justify keeping her out of work any further or keeping her on any significant restrictions any further." (TR 24, 212). Dr. Chamberlain reports that he "advised her to continue her range of motion strengthening exercises, [and] to resume full activities in the next two weeks at work." (TR 212). The ALJ also cited her primary care physician, Dr. Marrone, who opined on May 3, 2007 that Plaintiff "needs work" and independence. (TR 24, 334). The record is simply void of evidence supporting more restrictive limitations than those set forth in the enhanced examiner's assessment. The ALJ's error in attributing the enhanced examiner's assessment to a medical consultant does not warrant remand and the ALJ's finding that Plaintiff retains the RFC for a broad range of light work is supported by substantial evidence.

**3.**    ***Whether The ALJ Properly Considered Plaintiff's Drug And Alcohol Use and Allegations of Depression***

Plaintiff argues that the ALJ erred in finding that absent Plaintiff's polysubstance dependence disorder Plaintiff does not have a severe mental impairment. (TR 20). Plaintiff argues

14

that the ALJ did not give proper weight to Dr. Marshall's opinion, which did not identify a substance addiction disorder, or to Dr. Zaroff's diagnosis of major depressive disorder. (TR 124, 129, 131, 135-36, 342-44). The ALJ found that the only one of Plaintiff's severe impairments which that met the Listing was Substance Addiction Disorder Listing 12.09.

As an initial matter, the ALJ properly considered Plaintiff's drug use in his determination. Under 42 U.S.C. § 423 (d)(2)(C) and 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1) the ALJ is required to make a determination about whether alcoholism or drug addiction is a contributing factor material to a disability determination. 42 U.S.C. § 423(d)(2)(C) provides that "[a]n individual shall not be considered to be disabled for purposes of this [subchapter] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." *See also* 20 C.R.F. §§ 404.1535(a), 416.935(a). The regulations provide that "[t]he key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).

Dr. Marshall is State Agency Psychologist and a nonexamining medical consultant. Dr. Marshall completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment Form and diagnosed Plaintiff with depression with anxiety. (TR 120-37). The ALJ rejected Dr. Marshall's opinion on the basis that Dr. Marshall was "not privy to Exhibit 2F through Exhibit 4F, which contained vital information regarding the claimant's ongoing use of cocaine, overmedication with prescriptions drugs, as well as the results of the October of 2007 consultative psychological examination. Thus, their opinions are not reliable because they did not consider the impact of the claimant's polysubstance dependence disorder." (TR 24).

15

The ALJ properly considered Dr. Marshall's opinion. 20 C.F.R. §§ 404.1527(b), 416.927(b).

The ALJ, however, is not required to consider each opinion in a vacuum. The regulations state that

> When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, . . . the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion. 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6).

The ALJ gave a full explanation for giving less than full weight to Dr. Marshall's January 2, 2006 opinion that Plaintiff suffers from anxiety and depression and that she suffers from mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence and pace. (TR 24, 131). At least some of the records at Exhibits 2F through 4F were submitted on July 26, 2007, after the date of Dr. Marshall's review and many of the records post-date Dr. Marshall's review. (TR 284-345). There is no argument from Plaintiff that these records were available to Dr. Marshall at the time of his review. The records which the ALJ alleges were not before Dr. Marshall include the October 12, 2006 report that Plaintiff had been using crack cocaine for the past month and half and a noted positive urine screen for cocaine, an October 15, 2006 report of a positive urine screen for cocaine and Dr. Zaroff's Psychiatric/Psychological Medical Report. (TR 290-91, 327). The ALJ's decision to reject Dr. Marshall's opinion is supported by substantial evidence.

Next, Plaintiff argues that the ALJ did not properly evaluate Dr. Zaroff's Psychiatric/Psychological Report. Plaintiff argues that although the ALJ relies on Dr. Zaroff's opinion that if Plaintiff abstained completely from alcohol use and substance abuse and use, "her concentration would improve as would her cognitive efficiency, most ratings would drop at least one level" the ALJ did not sufficiently address all the areas of limitation, some of which would decrease

16

from marked to moderate if they went down one level. (TR 344). Plaintiff argues that no physician ever opined that but for the polysubstance abuse Plaintiff would not have a major depressive disorder. (Docket no. 8 at 11).

As Defendant points out, Dr. Zaroff opined that "most ratings would drop *at least* one level." (TR 344). This is not a precise calculation as Plaintiff proposes. Therefore, the ALJ's findings in this respect are not inconsistent with Dr. Zaroff's opinion. As with Dr. Marshall, the ALJ fully explained the weight he gave Dr. Zaroff's opinion and noted the areas where Dr. Zaroff questioned the accuracy of Plaintiff's performance on the tests. (TR 17). Dr. Zaroff noted that Plaintiff's performance on one of the tests appeared to be "symptomatic of exaggeration of symtomatology." (TR 340). He noted that she appeared over medicated and had poor motivation in performing on the testing. (TR 341). She missed easy items and her results were inconsistent with her educational background. Throughout both Dr. Zaroff's report and his completed Medical Source Statement of Ability To Do Work-Related Activities (Mental), Dr. Zaroff noted the major role that Plaintiff's drug dependency plays in her limitations. (TR 344). He concluded that she is not able to manage her benefit funds due to "ongoing drug abuse." (TR 342). Upon record review, Dr. Zaroff noted that the "[p]rimary feature of her case appears to be opiate abuse and dependence." (TR 341).

The ALJ correctly pointed out that Plaintiff has never sought mental health treatment and her testimony that she forgot to make the counseling appointment "does not support her allegations" of significant symptoms of depression. (TR 19). The ALJ found that Plaintiff's allegations about the extent of her limitations absent drug use are less than credible and set forth the areas in which he found her less than credible. Even if the Court were to follow Plaintiff's logic and reduce each of Dr. Zaroff's ratings of ability by one level, this would result in no marked limitations, and some moderate limitations and this alone does not result in Plaintiff's being disabled under the regulations.

17

The final determination of disability is left for the Commissioner based on all the evidence of record. Noticeably absent from Plaintiff's argument is the identification of any evidence of a specific mental limitation resulting from depression which the ALJ failed to address in the RFC. The ALJ properly considered evidence relating to Plaintiff's polysubstance abuse and found that Plaintiff's substance use disorder was a contributing factor material to the determination of disability from her alleged onset date through the date of the ALJ's opinion. (TR 25). The ALJ's findings are supported by substantial evidence.

**4.     Whether the ALJ's Hypothetical Question To The VE Is Supported By Substantial Evidence.**

Finally, Plaintiff argues that the hypothetical question to the VE was inaccurate. In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ found that when Plaintiff's polysubstance use is not considered, she has the RFC to perform a range of light work limited to lifting and carrying up to twenty pounds occasionally and ten pounds frequently, sitting for six hours and standing and/or walking for six hours of an eight-hour workday, avoiding constant pushing and/or pulling with the left lower extremity, and work that precludes climbing ladders, ropes and scaffolds. She can occasionally climb ramps and stairs, occasionally stoop, kneel, crouch and crawl and frequently balance[1]. (TR 21). As set forth above, the RFC itself is supported by substantial evidence as is that ALJ's determination that Plaintiff does not have mental limitations absent her substance abuse. To

---

[1]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

the extent Plaintiff argues that the VE testified that based on Plaintiff's testimony there would be no jobs which Plaintiff can perform, the ALJ made findings regarding Plaintiff's credibility[2].

As an initial matter, the ALJ concluded at step four that Plaintiff can perform her past relevant work as a production worker because the VE testified that the work was light and unskilled and that the occupational evidence provided by the VE was consistent with the dictionary of occupational titles and no discrepancies are noted between the Plaintiff's description of her duties and the Dictionary of Occupational Titles ("DOT").  (TR 21, 25).  There is, however, no testimony by the VE as to whether someone with Plaintiff's RFC and the additional exertional limitations, for example the need to avoid climbing ladders, ropes and scaffolds and limited to occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling, can perform Plaintiff's past work as a production worker.  Moreover, the VE did not provide a DOT code for Plaintiff's past work, so it is unclear how the ALJ determined that this position as it appears in the DOT and as Plaintiff describes it is consistent with the ALJ's RFC.  The ALJ's finding at step four that Plaintiff can perform her past relevant work is not supported by substantial evidence.   This is harmless error, however, because the ALJ went on to make a step five determination of whether there is other work in the economy which Plaintiff can perform.

_____

[2] Plaintiff has not challenged the ALJ's credibility determinations in this matter, but it is worth noting that the ALJ gave specific reasons for his credibility findings, as required by SSR 96-7p. The ALJ gave a detailed citation to statements by Plaintiff throughout the record which were inconsistent.  (TR 17-19).  The ALJ notes Plaintiff's failure to seek mental health treatment.  (TR 19).  He also notes a lack of objective medical evidence supporting certain allegations by Plaintiff, including her allegations of carpal tunnel syndrome, symptoms of depression and anxiety, and disabling pain and limitations from her left knee.  (TR 16, 17, 21).   In addition to objective medical evidence, the ALJ considered all the evidence of record in making his credibility determination.   See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

The regulations provide that "[i]f someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).  The ALJ's hypothetical question to the VE was more restrictive than the ALJ's ultimate RFC findings.  The hypothetical question incorporated a sedentary exertional level when the ALJ asked the VE to consider the claimant (Plaintiff) with the ability to sit for eight hours a day, stand and/or walk for eight hours a day, frequently shift form sitting to standing and able to lift only ten pounds frequently.  The VE testified to numerous sedentary jobs which Plaintiff can perform in the region.  (TR 374-75).  The ALJ's decision that Plaintiff retained the RFC for a restricted range of light work is supported by substantial evidence.  The ALJ properly relied on the VE's testimony to find that there are a significant number of sedentary jobs available in the economy which Plaintiff can perform.

## VI.    CONCLUSION

The ALJ's opinion is supported by substantial evidence.  Defendant's Motion for Summary Judgment (docket no. 10) should be granted, that of Plaintiff (docket no. 8) denied and the instant complaint dismissed.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Sec'y*

20

*of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated:  July 13, 2009                     s/ Mona K. Majzoub
                                          MONA K. MAJZOUB
                                          UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated:  July 13, 2009                     s/ Lisa C. Bartlett
                                          Courtroom Deputy

21